Yes, Your Honor. May it please the Court. Of all the issues in these appeals, one of the most important to my clients is presented by the District Court's order in limine, which prevented us from proving and covering the largest component of our damages. JMS and JMS North America used infringement as a purposeful tool to prevent Medisystems from obtaining another in a series of multi-year contracts to supply its largest customer, Fresenius, with patented Medisystems. They switched to a non-infringing alternative. Your Honor, they locked up a contract through infringement. And they switched to a non-infringing alternative. Are you saying that once someone is infringed, let's say I enter into a contract with Judge Schall to supply him with goods for 100 years. For the first 10 years, I have an infringing product that I supply him. Does that mean I'm going to pay damages for 100 years? Your Honor, there are two court requirements, but for causation and reasonable objective foreseeability. Now, 100 years raises some questions about objective reasonable foreseeability. But the facts of this case strongly supported that and amply provide the jury with a basis for finding foreseeability. And in fact, this damage was foreseen by JMS, was intended by JMS, and was in the contract. We marked as a visual. Well, you get compensation for infringement. Didn't you get compensation for the infringement of the platypus when they switched to the wing eater? That didn't infringe, did it? Mere sales of the wing eater did not infringe, Your Honor. And we never pursued mere sales of the wing eater. But what we pursued was offers for sale of the platypus and sales of the platypus that result in depriving us of sales of the patented product. And it doesn't stop either the but-for causation or the reasonable foreseeability that there's a transition. JMS recognized expressly in internal documents that it had to come out with a product immediately or Metasystems was going to lock up business in multi-year contracts as it had been doing and as it was an industry practice. Now, JMS could have simply waited, come out with its non-infringing product, and offered it to a given customer the next time the contract was up for renewal. But JMS didn't want to do that. It wanted to capture business it could only capture through infringement. As a result, when it did have the wing eater ready, it didn't have to negotiate a contract or compete with anyone else to obtain a contract with Fresenius. It already had a contract with Fresenius, and under visual aid tab one, Your Honors, can see that contract expressly provided for the transition when the wing eater was available. But wasn't Fresenius looking for an alternative source before it signed that contract? They certainly were, Your Honor, and a jury should have been allowed to find whether they would have gone with an alternative source. There was very powerful evidence that it wouldn't have for a variety of reasons. They were also aware of the wing eater design at that time, before they signed the contract. They were aware of it, Your Honor, but it wasn't approved, it wasn't on the market, and it wasn't available in sufficient quantities for Fresenius for almost a year after the contract was signed. So it wasn't a product that was available to comply with the needle safety legislation that was going into effect the same day that Mr. Fresenius signed the kind of reasonable assurance that Fresenius could meet its huge monthly requirements for guarded needle sets, for life-saving treatment for the patients of the country's largest dialysis chain. So the question here is really, should infringement pay under the circumstances of this case? If the trial court was correct in departing from the right height foreseeability standard, then under situations where there are multi-year contracts up for bid, it is rational and rewarded conduct to infringe as a way of fulfilling the initial requirements in the initial part of the contract so that you get to keep the contract and stop paying damages as soon as you get your substitute online. Furthermore, you have an incentive not to bother with forward-looking research and development, developing safety products years before they're under a government mandate, because when the government safety legislation goes into effect and your competitor is poised to finally truly profit from its years of research and development and promoting safety, you can just step in with an infringing product and take their business away, prevent them from getting the expected rewards, and mitigate your damages by transitioning to another product later, which you don't have to start working on in advance. So the trial judge departed from right height because, frankly, he misunderstood right height, he misunderstood the law with regard to Panduit as one standard for proving but-for causation as somehow creating an exception to right height foreseeability, and he misapprehended public policy because he felt that he was concerned about disincentivizing development of non-infringing products. But if a non-infringing product is valuable to society, our capitalist system creates ample incentives to develop it and put it on the market without having to get a bootstrap from infringement. And if there— The contract with Fresenius, J.M.S. contract with Fresenius, contemplated both the platypus product and the wing-eater product, correct? That is correct, Your Honor. It said we're going to start you off with the—it had minimum requirements— So that was entirely foreseeable that as soon as the wing-eater became available, was approved, and the regulatory process was underway, that as soon as it was approved that that would be substituted or that would be available for purchase. That was all foreseeable, correct? It was foreseeable and actually foreseen and intended. Then why is it a proper basis to assert damages for all of those sales as if the contract only specified for the infringing product with some contingency later on that might or might not occur to transition to a non-infringing product? Well, Your Honor, it was a planned contingency. Planned contingency to purchase non-infringing goods. Does that make a difference? No, Your Honor. Well, it actually cuts the other way, Your Honor, because it shows foreseeability under the right-type standard that they knew, they, J.M.S., knew that the result of this infringement was that they would get these later sales that we were prevented from recovering with regard to or we were prevented from recovering loss of sales of our patented product that were lost because of this. And the public policy, powerful public policy, 284 saying that you shall be compensated for infringement, is that if there's infringement, generally the caused, in fact, damages are recoverable. And that's the arrow of Supreme Court cases and many others. Then the exception is where there's no probable cause, which, according to this Court's precedent, is it wasn't foreseeable. It wasn't reasonably foreseeable. Here it was foreseeable. And why should that make it proximate cause? Well, one thing, it is proximate. It is direct. It's in the same contract. It's practically automatic in the sense that there's no new contract. There's no opportunity for a competitor to come back in. It's not even a step removed. It's the same requirement that just transitions from one to the other. Was Fresenius free to purchase off-contract under that agreement? In other words, could they have elected to purchase similar devices from some other party at any time during the agreement? Well, they'd still have to pay for the minimum requirements they were agreeing to purchase, so it wouldn't make sense to do so. Also, as a practical matter, they're running the country's largest dialysis chain. If they're buying $300,000 a month of a given product under a minimum purchase requirement, well, I suppose maybe the requirements for that month are $310,000, but it would be administratively and from a clinical perspective unacceptable to use a different product for the $10,000. So as a practical matter, on getting the contract, they locked up Fresenius for two years, and they prevented Metasystems from getting a commitment to buy its patented products for a period which was under negotiation, but would have been at least two years because Fresenius had offered that, and we believe would have been four years. So the flip side of this is saying that patent owners should suffer an uncompensated loss of sales of their patented products if an infringer uses infringement to lock up those sales and then does a transition, and that infringers or companies should have an incentive to infringe if they can bring in a non-infringing product later. So you're taking away part of the reward and incentive for inventions. You're creating an incentive to infringe, and there's no offsetting social benefit because if the product is in fact valuable, there will be an incentive to bring it out, regardless of whether you can sell it to a particular customer that you've locked up through infringement. It can compete on its own merits. Nor does Daubert justify the trial court's ruling, and that's true for a number of reasons. One of the many reasons is that the trial court's basis first and foremost for his Daubert ruling was his conclusion that as a matter of law, these types of damages should be prevented. So that was the methodological error. On the other points that the judge cited in his Daubert order, all of them were simply disagreements with the expert about what would have happened where there were conflicting facts and conflicting inferences. Those should have been given to the jury. Under microchemical, when the party's experts rely on conflicting sets of facts, it's not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony. But that's exactly what this judge did. And it even was so egregious as to have the judge base his Daubert ruling on factual inclinations of his own, which conflicted with the ultimate finding of the jury. For example, he believed the wing-eater would have likely been brought out earlier, and that was a flaw in the Dignan methodology. You're in the Europe battle time. You're aware of that. Thank you. I am. And Mr. Dignan, Dr. Dignan, actually explained why he thought that, and the jury agreed with him because they applied a more flow analysis, ultimately, where they implicitly rejected the idea that the wing-eater would have come out early and captured a larger percentage. I'd just like to make a brief remark on the price erosion damages of approximately $1 million. We've shown a bar graph on page 17 of our reply brief. There's really only one scenario here that explains the jury's verdict. It clearly didn't award those damages. It awarded $5 million without really breaking it out, right? How are you so confident that price erosion was not incorporated? Because it fit almost perfectly with the scenario of price erosion and rebates and incentives not being awarded, and with no other scenario. And the only reason it doesn't fit perfectly is that the jury used a different date than Dr. Dignan for where the transition occurred from royalties to lost profits, and they did that math themselves, and they disagreed with Dr. Dignan by about $30,000. So it's a perfect fit. The price adjustment clause, even the defendant's expert admitted that by its own operation, its price erosion, the computation is simply simple and undisputed just to multiply the price adjustment in the clause of the undisputed contract by the undisputed sales. So that doesn't even need to be remanded. We think that should be added to the judgment. Let me just briefly address the court's construction of a closing, which resulted in the court granting summary judgment of non-infringement as to most of the claims of the two patents in suit. That construction was contrary to the specification in multiple respects. The specification clearly used the term enclosed to refer to circumferential surrounding of an object. As it moved axially, it referred to something being enclosed but then emerging from the guard. Enclosing a central volume of part of a part or part of it sticking inside and part of it sticking out of the guard. And that's inconsistent with the judge's ruling that enclosing has to be at all times or ITL would have at all positions, and basically that the object has to be axially constrained. Under a correct construction, the judge's summary judgment order was inappropriate. On obviousness, we believe that the judge erred in not instructing the jury to resolve its lack of understanding of the test of the law of obviousness in hindsight. It's not enough under this court's case law that instructions be accurate. They have to be understood and given effect by the juror and able to be given effect by the jury. There was uncontested evidence that ITL contributorily infringed. The district court was incorrect in requiring that there be, in denying our new trial motion on the grounds that there had to be some kind of proof of direct nexus to specific acts of direct infringement. There were millions of guards sold. They had one use. There was no evidence to justify an inference that none of them were actually used, which automatically constituted infringement. So there was no basis for that judgment of no contributory infringement. On inducement, the trial court followed what we regard as the wrong standard. The correct standard is the Hewlett-Packard standard of intent to induce the acts that constitute infringement. Infringement, a manufacturer that sells its products shouldn't be able to escape responsibility for their uses directed on the grounds, for example, that they thought the claim was invalid or unenforceable. So the Hewlett-Packard standard makes sense, and it's the senior and therefore binding precedent in this court. And I'll reserve my remaining time. Thank you, Your Honor. OK. Mr. O'Brien, you'll have two minutes left. Mr. Bernstein. Mr. Bernstein, you're going to start. Mr. Zeitlin's going to start. Mr. Zeitlin will begin. Mr. Zeitlin, you've made a difficult decision of dividing up. We don't tell you when to stop or start, so you're going to have to be stopped when you're going to have to be the one to reserve time for your colleague. You may proceed. OK. I did say earlier that I wanted eight minutes for rebuttal, but I'll try to keep track of that with the clock in front of me. In any event, may it please the Honorable Court, I'd like to respond to this argument about this breach of contract argument that Dr. Degnan testified to, where there was supposedly a damages due to a non-infringing alternative, the wing eater. There was an in-depth, in limine hearing conducted, and there was a 40-page opinion that was written by Judge Jensen. And in that opinion, he went through why he was using his gatekeeper authority pursuant to the Daubert ruling, Supreme Court ruling, and was not going to permit this testimony to come in. I just wanted to quote very briefly from the court. The court also finds that even if the law allowed patent damages based upon the sale of non-infringing substitute in some category of cases, this is not such a case. He then went on and delineated why there was no causal connection, why there was no sound economic theory that permitted Dr. Degnan in this hypothetical world to come up with a hypothetical contract, including a hypothetical time period and hypothetical pricing, all of which were greater than any contract that previously existed. It's noted that in this particular case, prior to sale of the accused product of the platypus, JMS had already shown this non-infringing alternative to Fresenius, and Fresenius helped design this product. Fresenius indicated in 1999 that they— Therefore, you should be liable for the entire contract term. Well, we're going to live in the but-for world, but under the grain processing case. In the but-for world, we had this non-infringing alternative in 1999, and we could have, if possible, sped up the process to make this non-infringing weed eater product available. In fact, it was available under the logic of the grain processing case. Was it available? You didn't have FDA clearance yet, did you? We had FDA clearance, I think, in June of 2001. It had been shown in 2000, and under the logic of the but-for world in the grain processing case, it was available for purposes of lost profit calculation. The court went through an analysis in the Daubert ruling and said that there were several problems with Dr. Degnan's testimony, one of which was there was another product on the market, a Nipro product. It was on the market during the time frame when Dr. Degnan said this is when the contract between DSU and Fresenius was going to take place. That was not considered by Dr. Degnan. Judge Jensen said there was a wing eater product that was available under the grain process ruling. That was not considered by Dr. Degnan. There were off-contract sales. That was not considered. There was inventory. That was not considered by Dr. Degnan. This was a company, Fresenius, that specifically expressed the desire not to do business with DSU. When you add all these factors up, the court, under the standard of abusive discretion, certainly, did not abuse its discretion in saying there was no causal connection. There was no sound economic theory between what was being proposed by Dr. Degnan in this hypothetical contract and the reality of the economic world at the time. Hence, excluded Dr. Degnan's testimony on this point. We think the court was correct. And we think that the standard abusive discretion laid down in the Doe-Bear case and other cases, there has been no abuse of discretion whatsoever in this case. The second issue I'd like to address is this issue of lost profits. There was approximately $4 million in lost profits awarded because of Dr. Degnan's theory that there was a market that was going to be the Fresenius market and then there was going to be the rest of the market. This is not a national market. But when you divide the market up like that, Dr. Degnan testified that but for the sale of the platypus, the Q's product, DSU would have made approximately 80% of the sales to Fresenius. And recall, this is the company that said we don't want to do business with DSU. This was the company, Fresenius, that helped in the design of the non-infringing alternative, the Wing Eater. The Wing Eater sold for less than the DSU's product, the Master Guard. The market was fragmented. There were a lot of other products in the market at that time. And I brought some of them. They're already in record. But there were a lot of other products in the market at the time. Many of these products had various different features. And under the holding of the BIC case, this was specifically why the court said, at least my understanding, that because the market was so fragmented, because there were so many other reasons why people were purchasing one product or the other, we're not going to award lost profit damages because the market just was, you can't, you couldn't predict with any reasonable economic certainty. There was no causal connection between the sale of the Wing Eater product, excuse me, the sale of the Q's product, but for that, the sale would have been made by the Master Guard. It was just too speculative. And hence, lost profits were not permitted in that case. We believe the same case exists here. Fragmented market. Lower prices. Other non-infringing alternatives on the market. A company that said that we don't want to do business in effect with DSU. All add up to this is not a lost profit case. This theory should never have been presented to the jury. We filed a JMO motion. Unfortunately, there was no written decision. It was just denied. We think I'm reflecting now. Now is the time for the court to reverse that or to remand it. Reasonable royalties is all that is deserved in this particular case. Last point. The product issue, the platypus, it was a Markman ruling. It was part of the Markman ruling for the claim, for the product determined to be infringing. The court found and construed the claims that a slot had certain characteristics and that it was capable of receiving a little wing. I'm going to demonstrate that to the court, but I think it's all record to demonstrate it to the court. We respectfully submit that the court made a mistake. Most of it made a mistake as part of its Markman determination. The slot should have been properly construed as an opening with constant dimensions that facilitates the sliding back and forth of the wings. The reason why we say that is because on two different occasions, it was a specific representation made to the patent office that in order to distinguish a prior art reference, the wings in the patented device slid back and forth. We think that anyone reading the file history on two different occasions sees this. That's how they would understand the claim to be properly interpreted. That's the limitation that should be read. It should not be read as capable. The Hughes prior art had perpendicular ears. Isn't that a pretty big distinction? Yes, it is, Your Honor. I think that's the prior art you're telling us we should take into consideration. I'm actually talking about the Magrave reference. That's the one where the wings slid against the skin. In distinguishing the Magrave reference, there was an argument submitted that basically said that, I think it was part of an IDS presentation, that claimed invention didn't have that sliding against the skin. It slid back and forth. It readily slid back and forth. It was between a slot, not against the skin. I would reserve the rest of my time. Thank you, Mr. Bernstein. Good morning, and may it please the Court, I'm Mark Bernstein on behalf of Crosspell and ITL Corporation. I'd like to address briefly three issues today and whatever else the Court would like to talk about. The proper construction of slot, what inducement of infringement means, and what contributory infringement means in this particular context. If it please the Court, in this case, and as the Court knows, there were amendments made to claims being prosecuted which resulted in them being allowed after having been rejected previously. DSU invites this Court to come to the conclusion that no scope was surrendered in the process of amending claims to narrow them to overcome prior references, and we know that that can't be the case. There was scope surrendered. The Court knows that there were two kinds of claims that were at issue and that were rejected initially. The combination of claims had a sliding needle assembly with a needle, a hub, wings sticking out through slots in a protective guard. And the other claims were just the guard itself and not the needle assembly. Now, as Judge Rader mentioned a second ago, the Hughes reference did show a needle hub wing sticking out through a slotted guard, and the needle assembly slid back and forth between that.  They were perpendicular, and it meant that the slot had to be wide to accommodate these perpendicular wings going back and forth. The amendment that, after all these claims were rejected, that the applicants offered was one where the wings would have to be planar, in the same plane as the needle, so that they had to be very thin, not the perpendicular wings of Hughes. Well, that was fine for the combination claims, which were sighted wings and a needle assembly, but, of course, the stand-alone claims didn't. The stand-alone claims only recited a guard. So the question arises, how could a change to the needle assembly and the wings make the difference between patentability and lack of patentability for a guard that doesn't have wings at all? The answer to that question, Your Honors, is the one that DSU itself proposed to the District Court and, in fact, vigorously argued there, which is that you can describe a component in terms of the structure that the component is meant to work with. In this case, as DSU noted to the Court below, the planar wings that the amendments required were different than what a guard— excuse me, they would impose a difference in structure on the guard that had to accommodate those wings. So whereas in Hughes the wings were perpendicular and wide, by making the wings planar, what DSU told the Court was that essentially the slot had to narrow in order to accommodate that. What happened in the course of that happening with those claims— and we think DSU was quite right at the District Court— is that a slot that was wide enough to accommodate anything from planar to perpendicular wings was surrendered. A slot that had a range of sizes like that was surrendered. And now that the wings had to be planar, the slot had to be something that was narrow and not able to accommodate something like the perpendicular wing of Hughes. DSU was correct the first time about that. The slot is properly construed that way. And as so construed, we think that the Court can hold as a matter of law that the platypus, which expands quite widely and could fit perpendicular wings, should be held not to infringe. A couple of other points. First of all, on inducement. This is an important question, I think, for this circuit and for the country. I think that I'll start with a basic principle, which is that the idea of active inducement pre-1952 codification was an aiding and abetting kind of a standard. That's what Congress said when they codified the pre-existing law in 1952. That's what the Chisholm Treatise says and what the Law Review article DSU cites says. And interestingly, I think for present purposes, the Hewlett-Packard case itself characterizes the pre-1952 standard as, quote, plaintiff was required to show intent to cause infringement. So post-1952, we have a series of decisions which all go along this same track. The Framberg decision says in 1963, that's Fifth Circuit, purposeful, intentional, as distinguished from accidental or inadvertent conduct. There the accused inducer was trying to, quote, poach upon another's patent. And the court said, that's purposeful conduct. You're poaching someone else's patent. Then water technologies comes in 1988. That's this court. And that's important because we just heard Mr. O'Brien cite Hewlett-Packard as the senior case. I would say that all of these cases, but especially including water technologies as the senior case, that specified that the standard was, quote, a specific, knowing intent to induce infringement. It's interesting that only after analyzing and rejecting the defendant's purported good faith belief in non-infringement, in his non-infringement or non-infringement of the product, did the court uphold inducement liability. The court actually specifically noted that there was no advice of counsel that would have shown that this particular inducer was acting in good faith. And let's turn to HP itself now, 1990. If you read HP carefully, and this is going to be perhaps a controversial point, but it's not controversial if you look carefully at the case, I don't think Hewlett-Packard intended to introduce a new standard. First of all, Hewlett-Packard used interchangeably the standard of you have to have the intent to induce infringement, and the other one, which created these sort of spin-off cases, intent to cause the acts that constitute infringement. ITL would submit that that formulation is just another way to say intent to cause the infringing acts, because that's what HP itself did. It looked to see whether there was intent to cause infringing acts, and only when it didn't find any infringement intended did it decide that the inducer was not liable, was not an inducer. This court in Metabolite Labs read these cases the same way. It cited the intent to cause inducement, actually cause inducement, and it cited Hewlett-Packard for that proposition. I would submit, though, I think most importantly, that if there was an era of ambiguity about what the right standard was, it ended in June of 2005. That's when the Supreme Court decided the MGM v. Grokster case. It did a searching inquiry of what the standard for inducement was. It was very important to the Grokster decision to understand what patent inducement was in order to then incorporate that into the copyright world. And what the court said was that the required level of intent, this is the Supreme Court in Grokster, is, quote, active steps taken to encourage direct infringement, or, quote, an affirmative intent that the product be used to infringe. It cited water technologies for the rule being, quote, one who actively and knowingly aids and abets another's direct infringement is liable. And it was mindful, and here's the policy angle on this, it was mindful of the need not to stifle or trench on, as the court said, legitimate commercial competition. It wasn't supposed to be that you reached innocent inducers who had half a dozen opinions of counsel, all of which said that the article doesn't infringe. It turned out they were wrong. That's not what intent to cause active inducement has ever meant. If there's no intent requirement for direct infringement, why should there be an intent requirement, an intent to infringe as an aider and abetter? Well, I think that the standard is different purposely, Your Honor. If you consider the example of the inducer who doesn't know the patent exists, that inducer is liable, excuse me, is not liable because it's definitely an element that you have to know the patent exists, whereas if you talk about a direct infringer, that person might not know that the patent exists. They're still liable because they're on constructive notice. So the point is they're not treated the same, and the reason they're not treated the same is that the courts have been very careful. Also in Roman Haas v. Dawson Chemical, the whole idea of those cases is be careful not to extend the reach of inducement liability so far that you're going to stifle competition, and that's why when you're going outside of the set of the direct infringers, you have to be careful to strike a balance. That's what the court did in Grokster, and I think that that decision is the writing on the wall for the intent standard. I'll reserve the balance at this time. Thank you, Mr. Bernstein. Mr. O'Brien. Thank you, Your Honor. You have two minutes remaining. Then I'll try to quickly point out that Mr. Zaitlin made some misstatements about things that Dr. Dignan supposedly did not consider. In our brief, we make the point he considered everything that the trial judge cited. He just reached different conclusions, and the conclusions were for the jury. The judge did have a hearing and have a long opinion, but he never made that decision without hearing the fact witnesses testifying about these products and the commercial market. When the jury did hear that, it decided, for example, that it did not believe the wing eater would have come out earlier, and the trial judge shouldn't have been able to make that decision for them in the context of this subset of damages. With regard to slot, the constant dimension argument is contradicted by repeated embodiments in the specification where there's a change of dimension. There's no reference to no constant dimension in the prosecution history. Magre was not a narrow opening because it was about a 180-degree opening. It's the same reason why an open barn door is not a slot. The sliding back and forth, the platypus does have the wings free to slide back and forth, except if they go in the locking means, and locking means are called for in the claims. That could hardly be what's being disclaimed. With regard to ITL's argument, the DSU never suggested anything at the trial court akin to that, nor did ITL. We would contend the construction it's putting forward is waived. In any case, it's not supported by the prosecution history. The prosecution history teaches that the Patent Office found that Hughes was adequately distinguished by an amendment that was made. The amendment had to do with the wings. It had nothing to do with the slot. It limited all the claims because the so-called stand-alone guard claims or guard-for-enclosing claims are limited in terms of being for-enclosing a needle with planar wings. Thank you. Thank you. O'Brien? Mr. Zeidman? Yes. You're confined now to the cross-appeal issues. Yes, correct. Just briefly on this market fragmentation, lost profits. They claim 83% of the sales to Presidnius would have gone to DSU, but if you exclude the sale to Platypus, our response is Presidnius preferred the wing eater. Wing eater costs less. It was designed by Presidnius. The market was fragmented. There's no causal connection. There's no basis for this award of lost profits. The court should have granted the JMO motion. It should not have permitted it. It should have granted the JMO motion. And I'm going to reserve the rest of my time for my colleague. Thank you. Very briefly, Your Honors, on the question of contributory infringement, which was part of our direct appeal. We have pointed out, and DSU has not contested, that this plain language of Section 271C requires conduct within the United States or importing into the United States. That takes care of the 30 million guards that were sold. I don't think that that was addressed by Mr. O'Brien at all, so I don't think there's anything for you to respond to at this point. All right. Thank you, Your Honor. Thank you. That concludes our morning hearing. All rise. The honorable court is adjourned until this afternoon at 2 o'clock.